Filed 10/13/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| TRACY RURAL COUNTY FIRE PROTECTION DISTRICT, | C095083 |
| Plaintiff and Appellant, | (Super. Ct. No. STK-CV-UWM-2019-0009687) |
| v. | |
| LOCAL AGENCY FORMATION COMMISSION OF SAN JOAQUIN COUNTY, | |
| Defendant and Respondent; | |
| CITY OF TRACY, | |
| Real Party in Interest. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Carter P. Holly, Judge.  Reversed with directions.

Reed Smith, Raymond A. Cardozo; Bowman & Berreth, Mark Charles Bowman, and Kevin J. Berreth for Plaintiff and Appellant.

Neumiller & Beardslee, Daniel S. Truax, and Rod A. Attebery for Defendant and Respondent.

Gregory J. Rubens and Bijal Patel, City Attorneys; Colantuono, Highsmith & Whatley, Michael G. Colantuono, and Jon R. di Cristina for Real Party in Interest.

In this appeal, arising under the Cortese-Knox-Hertzberg Local Government Reorganization Act of 2000 (Act) (Gov. Code, § 56000 et seq.),[1] Tracy Rural County Fire Protection District (Tracy Rural), joined by the City of Tracy (City), challenges a decision made by the Local Agency Formation Commission of San Joaquin County (San Joaquin LAFCO or the Commission). The decision, resolution No. 1402, adopted a governance model for fire services provided by the City and Tracy Rural "requiring that future annexations to the City . . . will detach from [Tracy Rural]." Tracy Rural asserts: (1) San Joaquin LAFCO does not possess the statutory authority to order detachment of fire protection services from Tracy Rural in future annexations of territory by the City, but rather must act on specific proposals for annexation or detachment, none of which was presently pending before the Commission; and (2) even if the Commission possesses the authority to order detachment sua sponte and in futuro, issuance of resolution No. 1402 nevertheless amounted to a prejudicial abuse of discretion because it was not supported by substantial evidence.

We conclude San Joaquin LAFCO did not have the statutory authority to issue resolution No. 1402. As we shall explain, a local agency formation commission (LAFCO) does not have the power to order a specific detachment outside of a proposal for such a change of organization, and may not initiate such a proposal on its own. While designated a "model," and referred to by the Commission's executive officer, James E. Glaser, as a "plan," resolution No. 1402 requires the City to include detachment in all future annexation proposals in order for such a proposal to receive consideration from the Commission. As Glaser explained, "in order for us to process an annexation," that annexation proposal "has to be consistent with this plan." In other words, if the City

---

[1]     Undesignated statutory references are to the Government Code.

submits an annexation proposal with detachment, the proposal is considered on its merits. If not, it is returned as not in compliance with resolution No. 1402. This effectively decides the detachment issue ab initio regardless of the specific facts of the proposal then pending before the Commission. A LAFCO "has only those express (or necessarily implied) powers which are specifically granted to it by statute." (*City of Ceres v. City of Modesto* (1969) 274 Cal.App.2d 545, 550 (*City of Ceres*).) Contrary to San Joaquin LAFCO's position in this appeal, none of the provisions it relies upon authorized resolution No. 1402. We therefore reverse the judgment entered in favor of San Joaquin LAFCO and remand the matter to the trial court with directions to issue a peremptory writ of mandate directing the Commission to vacate resolution No. 1402.

BACKGROUND

***Statutory Framework***

We begin with an overview of the statutory framework in order to place the background facts and procedure in their proper context.

The Act "was enacted 'to encourage "planned, well-ordered, efficient urban development patterns with appropriate consideration of preserving open-space [and agricultural] lands within those patterns" [citation], and to discourage urban sprawl and encourage "the orderly formation and development of local agencies based upon local conditions and circumstances." ' [Citation.] A LAFCO is the administrative body within each county that oversees urban development." (*Community Water Coalition v. Santa Cruz County Local Agency Formation Com.* (2011) 200 Cal.App.4th 1317, 1323-1324.)

In section 56001, the Legislature recognized that, among other things, that "the logical formation and determination of local agency boundaries is an important factor in promoting orderly development and in balancing that development with sometimes competing state interests of discouraging urban sprawl, preserving open-space and prime agricultural lands, and efficiently extending government services." (§ 56001.) Recognizing that "urban population densities and intensive residential, commercial, and

3

industrial development necessitate a broad spectrum and high level of community services and controls," and that "priorities . . . regarding the type and levels of services that the residents of an urban community need and desire" should be based on "weighing the total community service needs against the total financial resources available for securing community services," the Legislature declared "that a single multipurpose governmental agency [that] is accountable for community service needs and financial resources . . . may be the best mechanism for establishing community service priorities especially in urban areas." (*Ibid.*) However, also recognizing "the critical role of many limited purpose agencies, especially in rural communities," the Legislature further found "that, whether governmental services are proposed to be provided by a single-purpose agency, several agencies, or a multipurpose agency, responsibility should be given to the agency or agencies that can best provide government services." (*Ibid.*)

"[B]eing a creature of the Legislature exercising legislative functions [citation], [a LAFCO] has only such powers as are bestowed upon it by the Act." (*Timberidge Enterprises, Inc. v. City of Santa Rosa* (1978) 86 Cal.App.3d 873, 883 (*Timberidge Enterprises*).) Section 56375 is the principal statute granting power to LAFCO's, including the power "[t]o review and approve with or without amendment, wholly, partially, or conditionally, or disapprove proposals for changes of organization or reorganization, consistent with written policies, procedures, and guidelines adopted by the commission." (§ 56375, subd. (a)(1).) As relevant here, " '[c]hange of organization' " includes both "annexation [of territory] to a city" and "detachment [of territory] from a district." (§ 56021, subds. (c), (f); see also §§ 56017, 56033.) Section 56668 provides a list of factors to be considered in reviewing such a proposal.

"Either a public petition or an affected local agency's legislative resolution is required to request a change of organization." (*Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 910; see §§ 56650, 56069.) LAFCO's may not initiate a proposal for change of organization except as provided in section 56375,

4

subdivision (a)(2), which does not authorize LAFCO initiation of an annexation or detachment.  Subdivision (g) of that section, however, provides LAFCO's with the power to "adopt written procedures for the evaluation of proposals" and "adopt standards for any of the factors enumerated in Section 56668."  (§ 56375, subd. (g).)  Subdivision (h) also provides LAFCO's with the power to "adopt standards and procedures for the evaluation of service plans submitted pursuant to Section 56653" (§ 56375, subd. (h)), which requires the applicant of a proposal to "submit a plan for providing services within the affected territory."  (§ 56653, subd. (a).)

These and other powers and duties possessed by LAFCO's will be further discussed later in this opinion.  For now, we have provided enough statutory context for San Joaquin LAFCO's issuance of resolution No. 1402.  We now provide the factual context.

### *Provision of Fire Protection Services in the Tracy Area*

The City's fire department was established in 1910.  In 1945, Tracy Rural was established to provide fire protection services for, as the name implies, rural areas outside the city limits.  For many years, the City and Tracy Rural discussed consolidating their fire protection services.  As the City constructed new fire stations to meet the needs of a rapidly growing population, Tracy Rural firefighters often found themselves driving through parts of the City to reach a rural fire, passing City fire stations along the way.  Both entities recognized that consolidating services would lower response times and eliminate the duplication of resources.  By 1996, the City and Tracy Rural were in final negotiations to consolidate, with the City relinquishing fire protection responsibilities to Tracy Rural.  This consolidation never occurred.

5

Instead, in 1999, the City and Tracy Rural formed the South County Fire Authority (SCFA), a joint powers authority (JPA),[2] to provide fire protection services within their respective territories. As we describe in greater detail below, SCFA was dissolved in 2018 and a new JPA was established, South San Joaquin County Fire Authority (SSJCFA), to provide these services. Both JPA's received funding from the City's general fund (derived from property taxes, sales tax, & user fees) and Tracy Rural (derived from property taxes, a special assessment imposed for structures located within the district, & user fees).

### *Prior Annexations to the City and the Issue of Detachment*

Prior to the dispute in this case, San Joaquin LAFCO approved twelve proposals to annex territory to the City without detaching that territory from Tracy Rural.[3] The Commission explained in an October 2011 municipal services review: "As annexations to cities and detachments from the districts occur, the district's physical boundary and financial revenue shrink. Unfortunately, the district does not always experience a corresponding reduction in service costs. The district must still maintain the same number of stations, employ the same number of firefighters, and maintain the same amount of equipment and do all of this with less revenue." The review also noted that the policy of not detaching newly annexed territory from Tracy Rural "maintains the

---

[2]  A " 'joint powers authority' means an agency or entity formed pursuant to the Joint Exercise of Powers Act (Article 1 (commencing with Section 6500) of Chapter 5 of Division 7 of Title 1) that is formed for the local performance of governmental functions that includes the provision of municipal services." (§ 56047.7.) Section 6502 provides in relevant part that "two or more public agencies by agreement may jointly exercise any power common to the contracting parties . . . ."

[3]  In one case, the annexation of Tracy Hills, the portion of Tracy Hills territory that was then within Tracy Rural was annexed to the City without detachment from Tracy Rural, while another portion of the annexed territory, not then within Tracy Rural, was fully annexed to the City.

necessary funding for the JPA to operate efficiently because it allows property tax revenues as well as the special assessments to continue to fund the level of service that has been calibrated for single fire protection services throughout the Tracy area and to those revenues."

However, in a section titled "Implementation Strategy," the Commission directed the City and Tracy Rural to "[c]omplete a plan regarding the governance model for [the City's] Fire Department and Tracy Rural . . . within 18 months . . . . All subsequent annexation requests shall be consistent with the approved plan." (Underscoring omitted.) One reason for this directive was a concern that San Joaquin County (County) was losing revenue due to annexations occurring without detaching from Tracy Rural.

SCFA prepared a governance report, titled "Fire Governance Implementation Plan," in August 2013. That report discussed four governance options and recommended further evaluation of the following two: (1) strengthen the existing JPA; and (2) annex the City's territory into Tracy Rural for provision of fire protection services. The City submitted this report to San Joaquin LAFCO. However, the Commission determined it did not sufficiently address the fiscal and governance issues and returned the report to the City for further study, including all four governance options.

In December 2013, the City informed San Joaquin LAFCO that a consultant, Management Partners, had been hired to analyze these governance issues. At this meeting, the Commission requested that the new governance report " '*include the feasibility of detachment and no detachment of Tracy Rural . . . and the feasibility of a full consolidation of Tracy Rural and the City Fire service*.' "

After various continuances were granted, the requested governance report, titled "Alternative Fire Governance Structures," was submitted in September 2014. Three options were analyzed in the report: (1) maintain the status quo (annexation of territory to the City without detachment from Tracy Rural); (2) require existing and/or future annexed territories to detach from Tracy Rural; and (3) annex the City into Tracy Rural.

7

However, because the City did not indicate which of the three options it preferred, the Commission declined to determine whether future annexations to the City should detach or not detach from Tracy Rural and returned the report to the City.

### *Formation of SSJCFA and New Proposed Annexations*

In 2017, SCFA staff conducted a study evaluating three potential governance options. The new study was prompted partly because of the LAFCO concerns noted above and partly because "[Tracy Rural's] Board was concerned that they did not have the desired authority over fire protection policies and did not participate in financial, administrative and operational policy development, and approval and implementation for fire protection programs within their District boundaries."[4] The three options considered were: (1) the City detach from Tracy Rural; (2) the City annex into Tracy Rural; and (3) reconstitute and strengthen the JPA. SCFA staff concluded the third of these was the best option.

In February 2018, the City and Tracy Rural dissolved SCFA and formed a new JPA. The City and Tracy Rural agreed that this would allow them to resolve outstanding financial and operational issues while also allowing them to continue to combine their resources and personnel to continue providing fire protection services through a single entity, the newly formed SSJCFA. For example, SSJCFA eliminated Tracy Rural's $4.37 million obligation to the City, which was owed in connection with fire station 92, and transferred ownership of that station to the City.

SSJCFA submitted a governance review in December 2018. This review described in detail the three options analyzed by SCFA staff in the 2017 study. In

---

**4** Under the SCFA agreements, authority of Tracy Rural's board "was limited to budget approval and budget allocations for capital expenditures and maintenance of facilities within their District. Policy development, collective bargaining, personnel management, risk management, selection of a Fire Chief, and service level determinations were the responsibility of the City."

8

connection with the option that was ultimately chosen, i.e., forming the new JPA, the review noted: "One of the primary drivers of the creation of the JPA was the strategy for the City to not detach from the District when annexations occurred. This allowed the areas that were annexed by the City to maintain the District taxing authorities at their current levels in perpetuity." The review also identified two new annexation proposals, the Avenues with 250 homes and Tracy Village with 575 homes, for which annexation would be proposed without detachment from Tracy Rural, and stated that detachment "could delay the opening of future fire stations and impact service levels." The review later noted that San Joaquin LAFCO had initiated the governance discussion in 2011, specifically the detachment issue, in part because of the concern that the County was losing revenue " 'due to a loss of opportunity for the County to redistribute (to itself) ad valorem property taxes' " when an annexation occurs without detachment. The review concluded that this concern "does not fall within LAFCO's purview." The review further concluded that a second concern of the Commission, that the City was not providing full municipal services to its residents unless detachment occurred, was also not "within their purpose, authority, or purview."

On March 14, 2019, San Joaquin LAFCO held a board meeting during which the Commission stated it would not hold an April meeting, SSJCFA's governance review would be discussed at its May meeting, and the Commission would establish an ad hoc committee or workshop to address annexations.

Five days later, San Joaquin LAFCO wrote a letter to the City responding to the City's annexation proposal for Tracy Village and requiring the City to "complete a plan regarding the governance for the [City's] Fire Department and Tracy Rural . . . ('PLAN') subject to the approval of [the Commission]" and further requiring that "all subsequent annexations requests must be consistent with that PLAN." The Commission continued: "This step will determine if future annexations to the City . . . will detach or not detach from [Tracy Rural]. Although a document entitled **Governance Review** has been

9

received by this office, this PLAN has not been considered nor adopted by [the Commission].  As such, [the Commission] cannot make a consistency determination.  The PLAN needs to be completed prior to accepting the annexation application as complete.  This PLAN is anticipated to be considered by the Commission at its May meeting."

On April 15, 2019, county administrator, Monica Nino, wrote a letter to San Joaquin LAFCO's executive officer, responding to SSJCFA's governance review.  Administrator Nino explained that annexations of territory to a city require an existing agreement "between the requesting city and the county to specify how the existing property tax in the area to be annexed will be redistributed."  The City and County entered into a master agreement in November 2012 that provided:  "[F]or annexations that involve detachment from a fire district, reallocated property taxes are shared in the ratio of 80% for the County and 20% for the City.  For annexations that do not involve detachment from a fire district, reallocated property taxes are shared in the ratio of 85% for the County and 15% for the City for consolidated fire districts established between June 15, 1996 and June 15, 2003.  For consolidated fire districts established subsequent to June 15, 2003, reallocated property taxes are shared in the ratio of 90% for the County and 10% for the City."  With respect to the twelve previous annexations to the City without detachment from Tracy Rural, Nino stated:  "The reason provided for not detaching from the fire district was that the City and Tracy Rural anticipated the formation of a consolidated district where the fire district would be responsible for fire protection services in both the City and the District[;] however, to date, this consolidation has not occurred," resulting in "a significant loss of revenue for the County . . . approximately $74.2 million in revenue due to annexation without detachment for the twelve existing annexations."  Referring to the two proposed annexations mentioned in the review, Nino urged the Commission to require "annexation with detachment" for all

10

future annexations to the City in order to "ensure the County is provided necessary funding for increased demand on County services."

### *Special Meeting on the Detachment Issue*

On April 22, 2019, San Joaquin LAFCO held a special meeting on the detachment issue. The same day, Executive Officer Glaser submitted a report to the commissioners. He presented this report at the special meeting. We describe that presentation in some detail.

Executive Officer Glaser began by explaining that the matter before San Joaquin LAFCO was "to satisfy a requirement that was imposed by this Commission in October of 2011," specifically, to determine whether future annexations to the City should be detached from Tracy Rural. Glaser then explained that the 2011 municipal services review not only required completion of a plan for a governance model, but also required subsequent annexation proposals to be consistent with that plan. Glaser interpreted this to mean that the Commission had to decide the detachment issue in general before it could "process" or "consider" any specific annexation proposals.

Before specifically addressing the detachment issue, Glaser provided a brief summary of the background facts, including a description of the various governance reviews that were submitted following the 2011 municipal services review. Explaining the policy of " 'no detachment,' " Glaser stated that Tracy Rural "continues to receive its share of property tax, which is about 11.6 percent of the tax increment," and also continues to collect its special assessment of "three cents a square-foot." After describing Proposition 13 (as approved by voters, Primary Elec. (June 6, 1978)), Glaser characterized the no detachment policy as "essentially an archaic tax rate system developed in 1979 that they're applying today, so there is [*sic*] large amounts of monies that are achieved through the fire district when you had this situation without detachment." Glaser also stated that the City benefits from the no detachment policy because it is not obligated to provide fire services in the annexed territory.

11

Turning to detachment as a model, Glaser explained that Tracy Rural's share of the property taxes would be divided between the City and the County under a tax sharing agreement. Glaser argued that the County needed that share of the property taxes: "The County still has increased service needs as a result of development. The County provides a lot of services, of health services, social services, all the different services related to -- to enforcement of all the different things, Parks and Recreation and everything else, so there's still a need for additional monies to the County as a result of development." He further stated that detachment was the model used by Stockton, Lodi, and Manteca.

Glaser then argued that cities, not special districts, are "clearly" the most capable of providing funding for fire protection services because they "have more financial resources available" to devote to fire protection. He further argued that there should not be "overlapping spheres of influence," but rather the Act "declares that a single multipurpose agency is accountable for government services in a better manner and especially for -- for urban areas, again pointing to the fact, cities ought to be doing this . . . ." Addressing the potential counterargument that a single entity does provide fire protection services for both the City and Tracy Rural, i.e., SSJCFA, Glaser stated "that's the way in which the delivery of services" is provided, but "the responsibility for services is still two agencies." Glaser further argued that "Tracy Rural has not been financially successful" and "we're supposed to be . . . looking at the financial ability of agencies to provide the service, it's been a failure."

Finally, and importantly, Glaser noted "past annexations wouldn't be affected" because the Commission "cannot initiate detachments." Instead, the Commission would require future annexation proposals to include detachment in order to be considered by the Commission.

After Glaser and two County officials took follow-up questions from the commissioners, the City's finance director, Karen Schneider, addressed the Commission. Schneider began by noting that the City had "predicated most of [its] financial analysis

12

based on the non-detachment model." She noted the detachment policy the Commission was being asked to approve sought to "take cash, fiscal resources from one agency and give it to another" and asked the Commission "to not make that decision today," but rather allow the City "to continue working in the proper avenue of tax sharing agreements with the County." With respect to the no detachment model, Schneider argued the City and Tracy Rural had "created a financially stable model that will see us into the future, and . . . we can show that we are providing better fire services year after year . . . ." Acknowledging "some bad history," she nevertheless argued the current model provided "the best fire service in the County" and asked the Commission to move forward on the two annexation proposals, which she characterized as being held for "ransom" until there was "some type of agreement with Mr. Glaser" regarding detachment. Schneider urged the Commission to "continue allowing the annexations to move forward . . . because our model is fiscally sound and we believe we can work with the County" concerning "the right tax sharing agreement with the County." She further pointed out that the Commission's primary focus should be on fire service and concluded: "Again postpone this policy. It has long-term effects that nobody has been able to vet out. . . . Please don't do that today. Don't force us into a model that I can't say I can now support fire stations."

During questioning, one of the commissioners asked Schneider why the City "thought that it could play by different rules than other cities," i.e., Lodi, Stockton, and Manteca, with respect to detachment. Schneider answered that cities are unique and the City and Tracy Rural "have been able to show that we've been able to provide better fire services as a result of non-detachment, and so we ask that you keep that moving forward." The commissioner followed up by suggesting "that would be true with any agency that had more tax money" because it was "taking more County tax dollars." Schneider responded: "[T]here are two revenues at stake here that we forget. It's not just the property tax -- tax sharing agreement. . . . But you're also talking about the additional

13

assessment district that would be lost. So it's two sources of revenue that has supported fire services for decades, and it's those revenues and those losses of revenue that we're talking about. [¶] What this model[,] providing . . . excellent fire services to the residents[,] is the most important. What we're talking about again on the -- only on the property tax side is splitting that 11 percent. You're talking about taking 11 percent from [Tracy Rural] and splitting it between the [the City and the County], but you're also talking about losing that 3 percent assessment district."

The City's fire chief, Randall Bradley, also addressed the Commission. He stated: "This is a very high-performing model. So – so as far as a service delivery perspective, you're not going to find a better model than this. We have strategically located fire stations that are well-staffed and well-equipped. [¶] And when we talk economic development, the reason we can recruit some of these different entities into our jurisdiction is because we -- we provide a high level of fire pro[t]ection, and -- and we're able to do that because of -- of this model. [¶] So when -- when the Teslas of the world are looking at us and -- and Amazon puts one of their first fulfillment centers in our community, we're able to show that we can put 16 firefighters on-scene within three minutes . . . in order to stop loss quickly, in order to ensure that we do not interrupt international commerce. [¶] And so that's the model that we've created where we're able to attract businesses, and it's not only because of fire protection, but it's partly because of fire protection, so that's a piece of it."

In response, one of the commissioners stated: "I just want to be real clear that I don't think anybody here, at least from my perspective, is disputing the quality of fire protection service that Tracy has."

After further discussion between the commissioners and County officials about financial losses to the County because of nondetachment, versus additional money received by the County when new development occurs, the Commission heard from the City's mayor, Robert Rickman, Tracy Rural's attorney, Mark Bowman, the developer of

14

one of the two annexations being proposed by the City, and a representative from the local firefighters union.

The commissioners then made comments before voting on the matter. One of the commissioners stated: "[I]n this particular case, we're being asked to move a project forward, and to be able to move that project forward, from my perspective, it needs to be detached." Another commissioner concluded his comments with: "I support the detachment."

Resolution No. 1402 passed by unanimous vote. As previously stated, it provides in relevant part that San Joaquin LAFCO "[a]dopts the model requiring that future annexations to the City of Tracy will detach from the Tracy Rural Fire Protection District."

### *Trial Court Proceedings*

In July 2019, Tracy Rural filed a petition for writs of ordinary and administrative mandate, and complaint for declaratory relief. The petition sought, among other things, a peremptory writ of mandate directing San Joaquin LAFCO to vacate resolution No. 1402. The trial court considered briefing filed by Tracy Rural and San Joaquin LAFCO, as well as a joinder in Tracy Rural's briefing filed by the City, heard oral argument on March 4, 2021, and took the matter under submission. The trial court denied the petition. The trial court concluded San Joaquin LAFCO "had authority to adopt Resolution [No.] 1402 as part of its expansive powers to establish and adopt resolutions, written policies, procedures, standards, guidelines and statements and to exercise its powers consistent with those resolutions, written policies, procedures, standards, guidelines and statements in conducting its business in an orderly and efficient manner and encouraging the efficient provision of government services." Judgment was entered on June 4, 2021. This appeal followed.

15

DISCUSSION

# I

## *Standard of Review*

We begin with the standard of review. As Tracy Rural correctly points out, "a LAFCO annexation determination is a quasi-legislative act that may be challenged by a petition for writ of ordinary mandamus," citing *Protect Agricultural Land v. Stanislaus County Local Agency Formation Com.* (2014) 223 Cal.App.4th 550, 558 (*Protect Agricultural Land*).) "Ordinary mandate under Code of Civil Procedure section 1085 is used to review ministerial acts, *quasi-legislative acts*, and quasi-judicial decisions which do not meet the requirements for review under Code of Civil Procedure section 1094.5. [Citations.] In such cases, the appropriate standard is whether the agency's action was arbitrary, capricious, entirely lacking in evidentiary support, or failed to follow the procedure required by law." (*Martis Camp Community Assn. v. County of Placer* (2020) 53 Cal.App.5th 569, 593-594, italics added; see also *San Miguel Consolidated Fire Protection Dist. v. Davis* (1994) 25 Cal.App.4th 134, 152 [LAFCO "decisions are reviewed by ordinary mandamus rather than administrative mandamus"]; *San Joaquin County Local Agency Formation Com. v. Superior Court* (2008) 162 Cal.App.4th 159, 167 [same].)

Section 56107 also provides in relevant part: "In any action or proceeding to attack, review, set aside, void, or annul a determination by a commission on grounds of noncompliance with this division, any inquiry shall extend only to whether there was fraud or a prejudicial abuse of discretion. Prejudicial abuse of discretion is established if the court finds that the determination or decision is not supported by substantial evidence in light of the whole record." (§ 56107, subd. (c).) There is no assertion of fraud, so we confine our analysis to whether there was a prejudicial abuse of discretion.

The main thrust of Tracy Rural's challenge to resolution No. 1402 is that San Joaquin LAFCO did not possess the statutory authority to issue such a resolution. This is

a pure question of law, subject to de novo review on appeal.[5] (See *Lindelli v. Town of San Anselmo* (2003) 111 Cal.App.4th 1099, 1104.)

## II

### *Statutory Authority to Issue Resolution No. 1402*

Tracy Rural contends San Joaquin LAFCO does not possess the statutory authority to order detachment of fire protection services from Tracy Rural in future annexations of territory by the City, but rather must act on specific proposals for annexation and/or detachment, none of which was presently pending before the Commission. The City joins in this contention. We agree.

---

[5] Tracy Rural's appellate briefing also claims, in the standard of review section, that it "has standing to challenge the validity of Resolution [No.] 1402 under the validation statute," citing section 56103 and Code of Civil Procedure section 860. This assertion is somewhat strange since the latter section requires a validation action to be brought within 60 days of the action sought to be validated. (Code Civ. Proc., § 860.) Resolution No. 1402 was adopted on April 22, 2019. Tracy Rural's writ petition was filed on July 26, 2019, more than 60 days later. Tracy Rural, of course, is not seeking to validate resolution No. 1402, but rather to invalidate it. Code of Civil Procedure section 863 applies to reverse validation actions and requires such an action be brought "within the time . . . specified by Section 860." Other jurisdictional requirements are also set forth in Code of Civil Procedure sections 861, 861.1, and 862, none of which are claimed to have been satisfied by Tracy Rural. Thus, this action is neither designated as a reverse validation action, nor would it have been timely or properly filed as such an action. However, since Tracy Rural has drawn our attention both to section 56103 and to *Protect Agricultural Land*, *supra*, 223 Cal.App.4th 550, we note that section 56103 requires all challenges to a LAFCO's *completed* annexation determination be made "only [in] an *in rem* proceeding under the validating statutes or by a quo warranto proceeding filed by the Attorney General." (*Protect Agricultural Land,* at p. 558; see also *Hills for Everyone v. Local Agency Formation Com.* (1980) 105 Cal.App.3d 461, 466.) Accordingly, if resolution No. 1402 amounts to a completed annexation determination, Tracy Rural would have been required to challenge the resolution in a reverse validation proceeding; "a third party cannot sidestep those proceedings by purporting to invoke a different procedural vehicle, such as a writ of mandate . . . ." (*Santa Clarita Organization for Planning & Environment v. Castaic Lake Water Agency* (2016) 1 Cal.App.5th 1084, 1097.) However, as we shall explain, resolution No. 1402 neither initiated nor completed an annexation. Section 56103 does not apply.

17

San Joaquin LAFCO "has only those express (or necessarily implied) powers which are specifically granted to it by statute." (*City of Ceres*, *supra*, 274 Cal.App.2d at p. 550.) In interpreting the Act, we employ the following well-settled rules of statutory construction: "The primary goal in construing a statute is to ascertain legislative intent so as to effectuate the purpose of the law. [Citation.] To do so, we first examine the language of the statute, giving the words their ordinary, commonsense meaning and according significance to all words used, if possible. [Citations.] 'The statute's words generally provide the most reliable indicator of legislative intent; if they are clear and unambiguous, "[t]here is no need for judicial construction and a court may not indulge in it." [Citation.]' [Citations.] However, where 'the statutory language is ambiguous on its face or is shown to have a latent ambiguity such that it does not provide a definitive answer, we may resort to extrinsic sources to determine legislative intent. [Citations.]' [Citation.]" (*Guillen v. Schwarzenegger* (2007) 147 Cal.App.4th 929, 938-939.)

Section 56375 grants 18 specific powers to LAFCO's. We need not delineate each of them as many are obviously inapplicable. The most apposite here is the power "[t]o review and approve with or without amendment, wholly, partially, or conditionally, or disapprove *proposals for changes of organization* or reorganization, consistent with written policies, procedures, and guidelines adopted by the commission." (§ 56375, subd. (a)(1), italics added.) As previously stated, " '[c]hange of organization' " includes both "annexation [of territory] to a city" and "detachment [of territory] from a district." (§ 56021, subds. (c), (f); see also §§ 56017, 56033.) " 'Proposal' means a desired change of organization or reorganization initiated by a petition or by resolution of application of a legislative body or school district for which a certificate of filing has been issued." (§ 56069.) In other words, "[e]ither a public petition or an affected local agency's legislative resolution is required to request a change of organization." (*Board of Supervisors v. Local Agency Formation Com.*, *supra*, 3 Cal.4th at p. 910.)

18

While resolution No. 1402 was issued against the backdrop of the two annexation proposals noted in SSJCFA's 2018 governance review, i.e., annexation of the Avenues and Tracy Village, San Joaquin LAFCO was not reviewing either of those proposals when it issued the challenged resolution. Indeed, as Executive Officer Glaser made clear at the special meeting, those proposals would not be "process[ed]" or "consider[ed]" until a decision was made with respect to detachment. The proposals would then have to be consistent with that decision, or they would not be considered at all.

Tracy Rural argues resolution No. 1402 therefore "initiated a change in organization" by "purporting to declare the outcome on the issue of detachment of fire protection services of all future annexations to the City." Relying primarily on *Fallbrook Sanitary Dist. v. San Diego Local Agency Formation Com.* (1989) 208 Cal.App.3d 753 (*Fallbrook Sanitary*), Tracy Rural correctly observes that such a change in organization may not be initiated by the Commission. In *Fallbrook Sanitary*, the Fallbrook Public Utilities District (FPUD) proposed LAFCO approval of a plan to incorporate Fallbrook. The San Diego LAFCO approved the proposal, but added to it a provision reorganizing both FPUD and the Fallbrook Sanitary District (FSD). (*Id.* at pp. 755-756.) The Fourth Appellate District concluded this fell within LAFCO's power to review and approve a proposal for a change of organization " 'with or without amendment' . . . so long as the general nature of the subject matter [of the proposal] is not changed." (*Id.* at p. 760.) Agreeing with FSD's position that LAFCO's "have no power to initiate changes in organization or reorganization," the court explained that FPUD, "an affected agency," proposed the incorporation of Fallbrook, and the amendment to that proposal made by the LAFCO did "not involve a change in the general nature of [the] proposal" and therefore did "not represent any initiation of a proposal." (*Id.* at p. 764-765, fn. omitted.)

In so concluding, the *Fallbrook Sanitary* court distinguished *City of Ceres*, *supra*, 274 Cal.App.2d 545 and *Timberidge Enterprises*, *supra*, 86 Cal.App.3d 873 as involving situations in which "no proposal had ever been made to either commission" and therefore

19

the LAFCO in each case "lacked any authority to act." (*Fallbrook Sanitary*, *supra*, 208 Cal.App.3d at p. 761.) In *City of Ceres*, the Stanislaus LAFCO adopted a resolution purporting to establish tentative future boundaries for two adjacent cities, Ceres and Modesto. Thereafter, Modesto began preparing plans to install sewer lines in the unincorporated area within Ceres's tentative future boundaries. (*City of Ceres*, *supra*, 274 Cal.App.2d at pp. 548-549.) Ceres sought injunctive relief from what it considered to be "a 'wrongful and unlawful encroachment' into territory designated by the [LAFCO] 'to be within the sphere of influence of the City of Ceres.' " (*Id*. at p. 549.) The Fifth Appellate District held the LAFCO had no power "to establish tentative boundaries for local agencies in futuro," explaining "the extent of LAFCO's power is to approve or disapprove 'wholly, partially or conditionally' actual and precise proposals which are presented to it from time to time for its consideration." (*Id*. at p. 553, italics & fn. omitted; see also *Timberidge Enterprises*, *supra*, 86 Cal.App.3d at p. 885 [holding LAFCO's intervention in a lawsuit was "without statutory authorization, and otherwise beyond its powers"].)

After *Fallbrook Sanitary*, *City of Ceres*, and *Timberidge Enterprises* were decided, section 56375 was amended to allow a LAFCO to initiate certain changes of organization. (See Assem. Bill No. 1335 (1993-1994 Reg. Sess.) § 4 [amending section 56375 to give a LAFCO "the authority to initiate a consolidation of districts, dissolution, merger, establishment of a subsidiary district, or a reorganization that include any of these changes of organization"].) The current version of the statute provides: "The commission may initiate proposals by resolution of application for any of the following: [¶] (A) The consolidation of a district, as defined in Section 56036. [¶] (B) The dissolution of a district. [¶] (C) A merger. [¶] (D) The establishment of a subsidiary district. [¶] (E) The formation of a new district or districts. [¶] (F) A reorganization that includes any of the changes specified in subparagraph (A), (B), (C), (D), or (E). [¶] (G) The dissolution of an inactive district pursuant to Section 56879." (§ 56375, subd.

(a)(2).) Nothing in this subdivision authorizes LAFCO initiation of an annexation or detachment.

Accordingly, *Fallbrook Sanitary*, *City of Ceres*, and *Timberidge Enterprises* remain apt in the circumstances of this case. Viewed together, these cases establish that San Joaquin LAFCO possesses the statutory authority to amend an annexation or detachment proposal that is currently pending before it, and then approve the amended proposal, so long as the amendment does not alter the general nature of the proposal, but it does not have any authority to initiate and then approve its own proposal for annexation or detachment.[6]

Here, the City initially proposed annexation of the Avenues and Tracy Village without detachment from Tracy Rural. Had San Joaquin LAFCO accepted these proposals for consideration, amended them to detach Tracy Rural, and approved the amended proposals, we would have no difficulty affirming that decision, assuming, of course, that it was supported by substantial evidence.[7] But that is not what San Joaquin LAFCO did. Instead, the Commission refused to consider either annexation proposal until it decided whether or not *all future annexations* to the City should detach from Tracy Rural, an issue it raised on its own in 2011. Resolution No. 1402 resolved this issue in the affirmative and required the City to include detachment in any future

---

[6] We also note that section 56375 was further amended, effective January 1, 2001, to add the language relied upon by San Joaquin LAFCO, and our dissenting colleague, in this case, "consistent with written policies, procedures, and guidelines adopted by the commission." (Assem. Bill No. 2838 (1999-2000 Reg. Sess.) § 67.) This addition to the statute obviously does not authorize a LAFCO to initiate and approve its own proposal for annexation or detachment and therefore does not cast doubt on the continuing validity of these decisions. Whether this language nevertheless authorizes what San Joaquin LAFCO did in this case is another matter, which we address below.

[7] Because we conclude San Joaquin LAFCO did not possess the statutory authority to issue resolution No. 1402, we need not determine whether it was supported by substantial evidence.

21

annexation proposal in order for such a proposal to be considered by the Commission. By itself, this resolution does not initiate a proposal for annexation or detachment. What it does is establish a "policy" requiring the City to include detachment in any and all future annexation proposals submitted to the Commission; failure to do so means the proposal is not accepted for consideration. We conclude this is akin to the setting of future boundaries at issue in *City of Ceres* because San Joaquin LAFCO did this action on its own initiative, without any pending proposal before it, and the resolution operates in futuro. Thus, unless San Joaquin LAFCO can point to specific statutory authority for such an action, resolution No. 1402 exceeded its authority.

San Joaquin LAFCO argues "numerous other provisions" in the Act, set forth immediately below, provide LAFCO's with "expansive powers to adopt resolutions, standards, procedures and guidelines and to establish written policies and procedures and exercise its powers consistent with those policies and procedures." The first indication of such broad authority, the Commission argues, is in section 56375, subdivision (a), itself. As already stated, this subdivision provides LAFCO's with the power "[t]o review and approve with or without amendment, wholly, partially, or conditionally, or disapprove proposals for changes of organization or reorganization, *consistent with written policies, procedures, and guidelines adopted by the commission*." (§ 56375, subd. (a)(1), italics added.) Subdivision (g) of that section also provides LAFCO's with the power to "adopt *written procedures* for the evaluation of proposals" and "adopt *standards* for any of the factors enumerated in Section 56668." (§ 56375, subd. (g), italics added.) As mentioned, section 56668 provides a list of factors to be considered in reviewing a proposal for change of organization or reorganization. (§ 56668.) Section 56375, subdivision (h) also provides LAFCO's with the power to "adopt *standards and procedures* for the evaluation of service plans submitted pursuant to Section 56653" (§ 56375, subd. (h), italics added), which requires the applicant of a proposal to "submit a plan for providing services within the affected territory." (§ 56653, subd. (a).) Section 56375, subdivision (i) grants the

22

authority to "*make and enforce regulations* for the orderly and fair conduct of hearings by the commission." (§ 56375, subd. (i), italics added.)

We conclude none of these provisions, either alone or in conjunction, authorized the challenged resolution. Reliance on section 56375, subdivision (i) is obviously misplaced. Resolution No. 1402 has nothing to do with the orderly and fair conduct of hearings by the Commission. Nor can it be fairly characterized as a "procedure" within the meaning of section 56375, subdivisions (a) and (g). Black's Law Dictionary defines "procedure" to mean "1. A specific method or course of action. 2. The judicial rule or manner for carrying on a civil lawsuit or criminal prosecution." (Black's Law Dict. (8th ed. 2004) p. 1241, col. 1; see also Merriam-Webster's Collegiate Dict. (10th ed. 2000) p. 926, col. 2 ["a particular way of accomplishing something"].) Resolution No. 1402 does not set forth any rules of procedure for bringing or presenting an annexation proposal to the Commission; it dictates the substance of that proposal.

The best argument for the existence of authority to adopt resolution No. 1402 is that it amounts to a written policy or guideline with which any annexation approval must be consistent. (See § 56375, subd. (a).) Returning to Black's Law Dictionary, as relevant here, "policy" means "[t]he general principles by which a government is guided in its management of public affairs." (Black's Law Dict., *supra*, at p. 1196, col. 1; see also Merriam-Webster's Collegiate Dict., *supra*, at p. 898, col. 2 ["a high-level overall plan embracing the general goals and acceptable procedures esp. of a governmental body"].) Merriam-Webster defines "guideline" to mean "an indication or outline of policy or conduct." (Merriam-Webster's Collegiate Dict., *supra*, at p. 516, col. 2.)

Resolution No. 1402 is not a statement of general principles, e.g., "San Joaquin LAFCO views detachment as the best model for providing fire protection services where new territory is annexed to a city because cities are generally more capable of providing funding for fire protection services than fire protection districts and overlapping spheres of influence are to be discouraged." Such a policy statement is consistent with Executive

23

Officer Glaser's presentation at the special meeting. Resolution No. 1402 also goes beyond a statement of general goals or outline of policy or conduct. It specifically precludes consideration of annexation proposals that do not include detachment.

Nevertheless, we acknowledge that more specific and directive "policies" appear to have been contemplated by the Legislature when it amended section 56375 to require approval, amendment, or disapproval of proposals for changes of organization or reorganization to be consistent with such policies or guidelines. For example, as the Legislative Counsel's Digest to Assembly Bill No. 2838 notes, apparently referring to section 56100.1, the amendment "require[s] the policies and procedures [established by each LAFCO] to include lobbying disclosure and reporting requirements . . . ." (Legis. Counsel's Dig., Assem. Bill No. 2838 (1999-2000 Reg. Sess.) 6 Stats. 2000, Summary Dig., p. 337, par. (7); see Assem. Bill No. 2838, § 21.5 [adding § 56100.1].) The Legislative Counsel's Digest also notes, referring to section 56375, that existing law allowed a LAFCO to "require as a condition to annexation that a city prezone the territory to be annexed," and the amendments to the section would "require that prezoning, and would require that approval of the annexation be consistent with the planned and probable use of the property based upon the review of the general plan and prezoning designations." (Legis. Counsel's Dig., *supra*, at p. 337, par. (10); see Assem. Bill No. 2838, § 67 [amending § 56375, former subd. (a), now subd. (a)(7)].) Thus, it appears that specific requirements can be included as a LAFCO "policy," and specific conditions may be placed on annexation approvals.

But can a LAFCO institute a "policy" refusing to consider annexation proposals that do not include detachment? We conclude the answer is no. The problem is not that a specific condition is placed on approval of an annexation proposal, but rather that resolution No. 1402 places a condition on the City's submission of all such proposals in the future, *and that condition is itself a change of organization*. In other words, resolution No. 1402 cannot require all future proposals for annexation to include

24

detachment because detachment is defined as a change in organization that cannot be initiated by a LAFCO. Here, when the City proposes annexation with detachment for any proposals submitted after resolution No. 1402, the detachment component of those proposals is required by San Joaquin LAFCO. It would be pure sophistry to say the LAFCO did not initiate that particular change of organization by requiring it as a condition, not only of approval of the proposed annexations, but of accepting and reviewing those annexation proposals at all.

We further conclude resolution No. 1402 runs contrary to section 56001. As stated previously, in section 56001, the Legislature declared not only "that a single multipurpose governmental agency," such as a city, "*may* be the best mechanism for establishing community service priorities especially in urban areas," but also that many limited purpose agencies, such as fire protection districts, play a "critical role . . . especially in rural communities," and therefore, "whether governmental services are proposed to be provided by a single-purpose agency, several agencies, or a multipurpose agency, *responsibility should be given to the agency or agencies that can best provide government services*." (§ 56001, italics added.) This section makes clear that the dispositive issue to be decided is what agency *or agencies* can best provide the services. Preventing, from the outset, the City from proposing what it considers to be the best model for fire protection services, i.e., nondetachment from Tracy Rural, improperly limits San Joaquin LAFCO's consideration of that dispositive issue in the context of the specific annexation being proposed.

Nor is resolution No. 1402 a "standard," either for assessing "the factors enumerated in Section 56668," or "for the evaluation of service plans submitted pursuant to Section 56653." (§ 56375, subds. (g), (h).) As relevant here, a "standard" is "something established by authority, custom, or general consent as a model or example." (Merriam-Webster's Collegiate Dict., *supra*, at p. 1142, col. 1.) Resolution No. 1402 does not purport to operate as a model or example against which aspects of a proposal or

25

service plan may be judged. For example, one of the factors to be considered in reviewing a proposal is "[t]he need for organized community services; the present cost and adequacy of governmental services and controls in the area; probable future needs for those services and controls; and probable effect of the proposed incorporation, formation, annexation, or exclusion and of alternative courses of action on the cost and adequacy of services and controls in the area and adjacent areas." (§ 56668, subd. (b)(1).) Resolution No. 1402 does not set up the detachment model as the standard against which an annexation proposal shall be compared in assessing the foregoing factors. It instead requires detachment in the proposal itself.

Finally, the remaining provisions cited by San Joaquin LAFCO are even less convincing with respect to providing it with the authority it claims in this appeal. LAFCO's have the power to "initiate and make studies of existing governmental agencies," which "shall include . . . inventorying those agencies and determining their maximum service area and service capacities." (§ 56378, subd. (a).) Section 56425 requires LAFCO's to "develop and determine the sphere of influence of each city and each special district . . . and enact policies designed to promote the logical and orderly development of areas within the sphere." (§ 56425, subd. (a).) In order to do so, LAFCO's are required to conduct service reviews of municipal services provided in the county. (§ 56430, subd. (a).) San Joaquin LAFCO does not argue that resolution No. 1402 is a study of an existing governmental agency, i.e., Tracy Rural, or a determination as to Tracy Rural's sphere of influence. Instead, the Commission argues "many of the factors considered when adopting Resolution [No.] 1402" are also considered when making such a determination. We assume, without deciding, that this is true. However, the fact that San Joaquin LAFCO based resolution No. 1402 on considerations that would have allowed it to make a sphere of influence determination does not mean it could therefore do something entirely different, i.e., order detachment for all future annexation proposals. And while section 56425, subdivision (a), authorizes

26

"policies designed to promote the logical and orderly development of areas within the sphere" (§ 56425, subd. (a)), resolution No. 1402 does more than that. It effectively initiates future changes of organization by requiring detachment as a condition of submitting any future annexation proposal. For reasons already expressed, we conclude San Joaquin LAFCO had no authority to adopt such a requirement.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to (1) enter a judgment granting Tracy Rural's petition for writ of mandate, and (2) issue a peremptory writ of mandate directing San Joaquin LAFCO to vacate resolution No. 1402. Tracy Rural is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

/s/
HOCH, Acting P. J.

I concur:

/s/
EARL, J.

27

Renner, J., Dissenting.

I dissent from the majority's conclusion that the Local Agency Formation Commission of San Joaquin County (San Joaquin LAFCO) did not have the statutory authority to issue resolution No. 1402.

Government Code section 56375 authorizes a local agency formation commission (LAFCO) to review and approve "proposals for changes of organization or reorganization, *consistent with written policies, procedures, and guidelines adopted by the commission.*"[1]  (§ 56375, subd. (a)(1).)  The italicized language was added to the statute in 2001 and not discussed in any of the authorities relied upon by the majority. (Stats. 2000, ch. 761, § 67.)  The majority acknowledges the plain meaning of "guideline" is "an indication or outline of policy or conduct."  (Merriam-Webster's Collegiate Dict. (10th ed. 2000) p. 516, col. 2.; see Maj. opn. *ante*, at p. 23.)  A "policy" is "a high-level overall plan embracing the general goals and acceptable procedures esp. of a governmental body."  (Merriam-Webster's Collegiate Dict., *supra*, at p. 898, col. 2.) Resolution No. 1402 provides, in relevant part, that San Joaquin LAFCO "[a]dopts the model requiring that future annexations to the City of Tracy will detach from the Tracy Rural Fire Protection District."  The majority's assertion that the resolution "goes beyond a statement of general goals or outline of policy or conduct" is unpersuasive.  (Maj. opn. *ante*, at p. 24.)  Section 56375, subdivision (a)(1) does not limit the subject matter that can be covered by policies or guidelines.  Further, the statutory framework does not suggest a limit on this authority that would apply to resolution No. 1402.  Section 56375, subdivision (a)(2) lists the proposals a commission may initiate—none of which is a proposal for annexation or attachment.  I agree with the majority's implicit conclusion

---

[1]  Further undesignated statutory references are to the Government code.

1

that a LAFCO's power to issue guidelines and policies cannot include the power to initiate proposals it otherwise lacks the authority to initiate. (Maj. opn. *ante*, at p. 25.) But I disagree with the majority's conclusion that resolution No. 1402 is itself a change of organization. (Maj. opn. *ante*, at pp. 24-25.) This conclusion ignores the fact that the resolution does not initiate any changes in organization. Rather, the resolution requires that if an annexation to the City of Tracy is proposed, that future proposal must include detachment from the county fire protection district. For this reason, this case is distinguishable from *City of Ceres v. City of Modesto* (1969) 274 Cal.App.2d 545, in which a LAFCO adopted a resolution establishing tentative future boundaries. (*Id*. at p. 549.) Here, no tentative boundaries have been set. The requirement to detach will not be triggered unless and until a proposal for attachment to the City of Tracy is considered and accepted. I am not persuaded that the relevant case law or the plain language of section 56375 render resolution No. 1402 unauthorized.

Accordingly, I would address the issue of whether resolution No. 1402 was supported by substantial evidence.

                                    /s/
                                    RENNER, J.

2